UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EUSTACE LLOYD MOSELEY, | : | Hon. Joseph H. Rodriguez |
| Plaintiff, | : | Civil Action No. 09-3978 |
| v. | : | MEMORANDUM OPINION |
| | | & ORDER |
| PEPCO ENERGY SERVICES, INC. and | : | |
| PEPCO HOLDINGS, INC., | | |
| Defendants. | : | |

This matter is before the Court on Defendants' motion for summary judgment on Plaintiff's Complaint. Oral argument was heard on the motion on March 3, 2011 and the record of the proceeding is incorporated here. For the reasons expressed on the record that day, and those set forth below, the motion will be denied.

<u>Background</u>

Plaintiff Eustace Lloyd Moseley is an employee of Defendant Pepco Energy Services, Inc. ("PES"). He has been employed by PES or its corporate predecessors for over twenty-five years. PES, a subsidiary of Defendant Pepco Holdings, Inc. ("PHI"), provides deregulated energy and energy-related services for residential, small business, and large commercial customers.

Plaintiff was originally hired as an Engineer in 1984 by Atlantic City Electric ("ACE"); he worked at the Deep Water Generating Station in Salem County. (Moseley Dep., 17:3-6.) In 1986, Plaintiff was promoted to Lead Engineer, and was transferred to Beesley's Point Generating Station in Cape May County, where he worked for nine years. (Compl. ¶ 9.) From 1995 through 1998, Plaintiff was employed by an affiliated company, Atlantic Generation, as Project Engineer, in Pedricktown, with offices located in Mays Landing. (Moseley Dep., 16:21-17:2, 18:12-23.)

Thereafter, Plaintiff worked for Conectiv Thermal Systems ("CTS") as a Maintenance Manager at is operating plant, known as Midtown Thermal, located in Atlantic City, New Jersey.  Plaintiff worked in this position as a CTS employee from 1998 until a merger with PHI in 2002.  (Moseley Dep., 16:11-20, 18:23-19:7.)

In 1998, Thomas Herzog held the position of Vice President of CTS; he worked at Midtown Thermal from 1998 until May 2007.  (Moseley, 74:24-75:2; Frattarelli Cert., Ex. 7.)  Plaintiff reported directly to Herzog, and so did Plaintiff's co-worker, Steve Hynes, Manager of Operations at the Atlantic City Thermal Plant.  (Compl. ¶ 19.) Plaintiff has alleged that in 1999, the President of CTS removed Hynes from his position as Manager of Operations, for cause.  Plaintiff has also asserted that Hynes was transferred to the Energy Trading Group of CTS, located in Delaware.  (Compl. ¶ 20-21.) Plaintiff has further alleged that Kenneth Lehberger filled the Manager of Operations position in 1999, but Lehberger also became Plaintiff's immediate supervisor at that time.  (Compl. ¶ 22.)

 In or around 2002, CTS merged with Potomic Electric Power Company, Inc. ("Pepco"), and each company became a subsidiary of PHI.  (Compl. ¶ 24.)   Following the merger, according to Plaintiff, he continued to work for PHI, still as Maintenance Manager at Midtown Thermal, until December 31, 2009.  (Moseley Dep., 16:5-10, 19:8-16.)  He complains, however, that when Lehberger laterally transferred to Connectiv Energy in Mays Landing in late 2004, Hynes was named as Lehberger's replacement. (Compl. ¶ 26-27.)  Plaintiff takes issue with the circumstance that Lehberger's Plant Manager position was not posted by the company, in accordance with standard practice and policy.  (Compl. ¶ 28.)  He also appears to have been offended by the fact that his

2

direct supervisor was Hynes.  (Compl. ¶ 29.)  Plaintiff alleges that Hynes again had been terminated for cause in June of 2004, and should not have been re-hired by Herzog, but the two men were good friends and long standing associates.  (Compl. ¶ 30-31.)  Plaintiff contends that he was better qualified for the position, and more experienced, but he was not considered for Plant Manager.  (Compl. ¶ 35.)

In March of 2006, Hynes resigned his employment with Connectiv.  The position of Manager of Operations became vacant, and Plaintiff was again required to report to Thomas Herzog.  (Compl. ¶ 37-38.)  Plaintiff alleges that he absorbed Hynes' responsibilities without any additional compensation until September 2008.  (Compl. ¶ 39-45.)

Following the 2002 merger with PHI, employees were required to complete an annual ethics survey.  (Moseley Dep., 19:17-20:12.)  By March of 2007, Plaintiff and two co-workers, Deborah Reynolds and Charmaine Glenn,[1] had discussed their respective observations of Herzog's conduct, which they deemed questionable and possibly unethical.  (Compl. ¶ 48; Moseley Dep., 52:15-53:10, 54:14-21; Reynolds Dep., 34:16-35:20.)  Specifically, they felt that Herzog improperly used company assets and improperly hired immediate family members and friends who did not appear on the payroll.  (Compl. ¶ 48-52.)  The three decided to disclose this information on PHI's

---

[1]Deborah Reynolds was an Accountant assigned to work out of Midtown Thermal during the years 1999 through March 2008.  (Reynolds Dep., 26:24-27:6, 63:5-64:9, 66:12-15; Weiss Dep., 28:13-17.)  In March 2008, Ms. Reynolds voluntarily resigned, and moved to Florida.  (Reynolds Dep., 26:24-27:6, 67:22-68:1.)  Charmaine Glenn is an Administrative Assistant assigned to work out of Midtown Thermal, and has been for many years.  (Weiss Dep., 49:22-24; Frattarelli Cert., Ex. 7.)

annual "Ethics Survey."  (Compl. ¶ 46-48.)

The three planned to reveal that Herzog employed his daughter, Laurie, as his secretary in the summer of 2005 and the beginning of 2006 without posting the position first and in violation of PHI's anti-nepotism policy.  (Compl. ¶ 51; Moseley Dep., 21:3-25, 27:22-28:14, 53:11-54:13.)  In addition, while Laurie's name did not appear on Defendants' payroll, she was compensated by John Eigenbrood, a third party Information Technology contractor at the Midtown Thermal Plant in Atlantic City.  Plaintiff alleges that an arrangement was made where Eigenbrood paid Herzog's daughter with Defendants' funds in order to circumvent Defendants' policies.  (Compl. ¶ 52.)

Next, Herzog hired his girlfriend's daughter as his secretary after his daughter had gone back to school.  (Compl. ¶ 53; Moseley Dep., 29:15-23.)  Plaintiff believed this was in violation of Company policy because the position again was not posted.  (Compl. ¶ 53; Moseley Dep., 30:2-21.)  Herzog also hired his son as a project manager, again through a third party independent contractor, Walter Ratai.  (Compl. ¶ 54; Moseley Dep., 33:1-15.)  Plaintiff thought this was wrong because (1) Herzog circumvented the Company's hiring process, (2) it violated Company policy, and (3) Herzog's son was being paid $75.00/hr, which was more than Plaintiff was making.  (Compl. ¶ 54-55; Moseley Dep., 40:4-24.)

In addition, Plaintiff had learned that Herzog was improperly using the Company's Eagles' tickets for personal use.  (Compl. ¶ 56; Moseley Dep., 43:17-44:5; 46:4-9.)  Finally, Herzog had leased a new SUV with Company funds, but which was not approved by the Company.  (Compl. ¶ 57.)  Plaintiff, Ms. Reynolds and Ms. Glenn

had talked about this allegation, and agreed that it would be Ms. Reynolds who would specifically report this, "since she was the one who paid, processed the invoices." (Moseley Dep., 47:14-49:16, 50:13-51:23, 54:22-55:4, 61:13-16.)

Plaintiff, Reynolds, and Glenn also agreed that, before they filled out their surveys, Reynolds was going to call her supervisor, Peter McPhun, who was located in Arlington, Virginia, to let him know what they were going to do. (Moseley Dep., 59:8-60:4; Reynolds Dep., 10:8-25, 38:21-24.) Reynolds spoke to McPhun on Friday, March 16, 2007 about the concerns related to Herzog. (Compl. ¶ 58; Moseley Dep., 61:25-62:10; Reynolds Dep., 10:8-25, 38:21-24.) McPhun told Ms. Reynolds that they should "answer [the survey] honestly." (Reynolds Dep., 11:1-6.) In addition, McPhun said he was going to take these issues to the PES ethics officer, Peter Meier, Esquire. (Compl. ¶ 59; Moseley Dep., 61:3-10.)

Reynolds was contacted by Meier that following Monday, March 19th. (Moseley Dep., 60:8-17; Reynolds Dep., 11:1-6, 17:11-18.) Plaintiff was also contacted by Meier that same day. (Moseley Dep., 62:11-15.) During their phone call, Meier asked Plaintiff not to complete his survey until they were able to meet. (Moseley Dep., 58:13-59:7, 60:21-61:2, 62:16-25.) Also on March 19, 2007, Herzog's supervisor, David Weiss,[2] approached Plaintiff and initiated a conversation regarding the complaints about possible unethical conduct by Herzog. (Compl. ¶ 60.) Plaintiff advised Weiss that he was not comfortable discussing the matter with him. (Id.)

---

[2]David Weiss is the President and Chief Operating Officer of the Energy Services Unit of PES. Weiss's primary work location is in Arlington, Virginia. (Weiss Dep., 7:25-8:3, 17:6-19; Dewechter Dep., 24:17-25:9.)

Plaintiff met with Meier on March 20, 2007 in Plaintiff's office.  (Compl. ¶ 61; Moseley Dep., 58:13-20, 63:4-15.)  During his meeting with Meier, Plaintiff reported "Tom [Herzog]'s hiring practices, hiring his daughter, his girlfriend's daughter, and his son, and the fact that they were being paid through a third party.  I mentioned the fact that the 10 Eagles tickets." (Moseley Dep., 55:5-11, 63:16-64:1.)  Plaintiff believes he also briefly raised concerns that Mr. Herzog's hiring of two different contractors – Walter Rataii and John Eigenbrood – was not in the Company's best interests.  (Moseley Dep., 64:2-67:1.)

Following his meeting with Meier, Plaintiff was told by Meier to answer "no" to question number four of the ethics survey, "Do you certify that you do not need to make any disclosures of potential conflicts of interest or other concerns related to compliance by yourself or others with the PHI Corporate Business Policies in order to complete this certification form?," and to fill in what he felt were the improper actions.  (Moseley Dep., 67:24-68:4.)  Meier also told Plaintiff to electronically submit his ethics survey when he was done completing it, and give a copy to him.  (Moseley Dep., 68:9-69:3.)  Plaintiff filled out the survey that day, citing "Questionable practices relating to contractors, personnel hiring." (Moseley Dep., 55:15-57:5, 67:24-68:8; Frattarelli Cert., Ex. 10.)

An investigation ensued.  Following the investigation, effective on or about May 10, 2007, Herzog was escorted out of the building.  (Moseley Dep., 74:24-75:2; Reynolds Dep., 18:13-14.)  According to Plaintiff, on the day Herzog was escorted out of the building, Weiss called a meeting with him, Charmaine Glenn, Deborah Reynolds and Randy Brown, where he told them: "Tom was – had left the building. He told us that if anybody asked, we should say he is retired, and he also said that this leaves a black mark

6

on [Weiss's] career and that [Weiss] will never again hire a PHI employee." (Moseley Dep., 80:15-81:12.)

At a meeting on or about May 17, 2007, Weiss informed Plaintiff, Glenn, Reynolds, and Randy Brown that he would be posting two positions: Vice President (Herzog's previous position) and Plant/Operations Manager (the position left open by Hynes two and a half years prior). (Compl. ¶ 70.) In May 2007, the Plant Manager position was posted, and Plaintiff applied. (Compl. ¶ 72.) On May 25th, however, Weiss informed Plaintiff that he had decided to fill only the Vice President position, and let the new Vice President fill the Plant Manager position. (Compl. ¶ 73.) Plaintiff has interpreted this as retaliation for his disclosure of Herzog's conduct, which made Weiss look bad. (Compl. ¶ 75.)

On August 7, 2007, the Vice President's position was filled by Robert Dewechter.[3] The Plant Manager position was again posted, by Plaintiff was not aware of the posting, and therefore did not apply. The position was not filled. (Compl. ¶ 78.)

On March 8, 2008, Plaintiff received his annual performance evaluation from Dewechter; for the first time in twenty-three years, Plaintiff's performance review was negative. (Compl. ¶ 79.) Plaintiff feels that this negative performance review was a further act of retaliation for his disclosure of Herzog's conduct. (Compl. ¶ 83.) Plaintiff complained to Meier about the review, but Meier advised him that because Weiss said he

---

[3]Robert Dewechter is currently a Vice President with PES, and is assigned to work at and oversee Midtown Thermal, along with other PES operations in Atlantic City and Wilmington. He has been in that position since August 2007. (Dewechter Dep., 9:20-10:8, 23:7-8.) As the Vice President working out of Midtown Thermal, Dewechter reports directly to Weiss. (Weiss Dep., 25:9-15, 44:19-45:3.)

had no input on Plaintiff's evaluation, it was not an act of retaliation.  (Compl. ¶ 85.)

On or about June 11, 2008 the Plant/Operations Manager position was posted for the third time.  (Compl. ¶ 86.)  Plaintiff applied for the position, but it was offered to Steve Hynes, who became Plaintiff's direct supervisor on September 28, 2008.  (Compl. ¶ 88.)  Plaintiff alleges that he "was not promoted to the position of Plant/Operations Manager despite his experience performing the job for the previous two and a half years, qualifications for same and seniority, as a direct and proximate result of his prior complaints and/or disclosures regarding the Herzog illegal conduct and activities."  (Compl. ¶ 89.)

Effective January 1, 2009, Plaintiff became an employee of PES, but he remained in the position of the Maintenance Manager at Midtown Thermal, and remained employed by PES in that position until March 24, 2010.  (Moseley Dep., 15:15-16:4, 19:8-16.)  In March 2010, Plaintiff applied for, was interviewed and ultimately selected for a supervisor position with ACE (an affiliated company of PES and a subsidiary of PHI) that had been posted.  (Moseley Dep., 13:23-14:22, 15:5-10.)  Thus, beginning March 24, 2010, Plaintiff began a new position, as an ACE employee. (Moseley Dep., 13:23-14:6, 176:10-25.)  In this new position, Plaintiff's salary and benefits have remained the same.  (Moseley Dep., 14:23-15:4.)

Defendants have moved for summary judgment on Plaintiff's single-count Complaint, arguing that Plaintiff cannot make out a prima facie CEPA claim because he has failed to identify "a law, or a rule or regulation promulgated pursuant to law," or "a clear mandate of public policy concerning the public health, safety or welfare," which the employer allegedly violated.  Alternatively, Defendants contend there is no causal connection between Plaintiff's alleged whistleblowing and some retaliatory action.

Discussion

A.  Summary Judgment Standard

"Summary judgment is proper if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law." Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56 (a).  The Court will enter summary judgment in favor of a movant who shows that it is entitled to judgment as a matter of law, and supports the showing that there is no genuine dispute as to any material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56 (c)(1)(A).

An issue is "genuine" if supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994).  Thus, to

9

withstand a properly supported motion for summary judgment, the nonmoving party

must identify specific facts and affirmative evidence that contradict those offered by the

moving party.  Andersen, 477 U.S. at 256-57.  "A nonmoving party may not 'rest upon

mere allegations, general denials or . . . vague statements . . . .'" Trap Rock Indus., Inc. v.

Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting

Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991)).  Indeed,

> the plain language of Rule 56(c) mandates the entry of summary
> judgment, after adequate time for discovery and upon motion, against a
> party who fails to make a showing sufficient to establish the existence of an
> element essential to that party's case, and on which that party will bear the
> burden of proof at trial.

Celotex, 477 U.S. at 322.  That is, the movant can support the assertion that a fact cannot

be genuinely disputed by showing that "an adverse party cannot produce admissible

evidence to support the [alleged dispute of] fact."  Fed. R. Civ. P. 56(c)(1)(B); accord

Fed. R. Civ. P. 56(c)(2).

In deciding the merits of a party's motion for summary judgment, the court's role

is not to evaluate the evidence and decide the truth of the matter, but to determine

whether there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

249 (1986).  Credibility determinations are the province of the factfinder.  Big Apple

BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

B.  CEPA

The New Jersey Legislature enacted the Conscientious Employee Protection Act

(CEPA) to "protect and encourage employees to report illegal or unethical workplace

activities."  Dzwonar v. McDevitt, 828 A.2d 893, 900 (N.J. 2003) (internal citation and

quotation omitted).

CEPA prohibits a New Jersey employer from taking "retaliatory action" against an employee who objects to "any activity, policy or practice which the employee reasonably believes" is in violation of applicable law.  N.J. Stat. Ann. § 34:19-3(c).  "To prevail on a claim under this provision, a plaintiff must establish that: (1) he reasonably believed that [the complained-of] conduct was violating a law or rule or regulation promulgated pursuant to law; (2) he objected to the conduct; (3) an adverse employment action was taken against him; and (4) a causal connection exists between the whistleblowing activity and the adverse employment action.  Sarnowski v. Air Brooke Limosine, Inc., 510 F.3d 398, 404 (3d Cir. 2007) (citation omitted).

The Act protects employees "who, with a reasonable basis, complain[] to [the] employer about the misconduct of co-employees, even in the absence of employer complicity in the misconduct."  Higgins v. Pascack Valley Hosp., 730 A.2d 327, 329 (N.J. 1999).

In circumstantial evidence cases, New Jersey courts apply the burden shifting framework of McDonnell Douglas and its progeny.  Fleming v. Corr. Healthcare Solutions, Inc., 751 A.2d 1035, 1041 (N.J. 2000).  Furthermore, New Jersey has adopted the identical analysis as its federal counterpart under § 1981 or Title VII regarding the causation element of a retaliatory discharge claim.  As recognized by the New Jersey courts, the prima facie element of causation and the element of causation in the subsequent ultimate proof stage of the case are often factually inseparable and therefore a court may rely on evidence provided in the earlier phase in resolving the latter. Donofry v. Autotote Sys., Inc., 795 A.2d 260, 270 (N.J. Super. Ct. App. Div. 2001) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000)).

11

C. <u>Analysis</u>

The first element of the prima facie case under CEPA is that the Plaintiff reasonably believed that the complained-of conduct (1) was violating a "law, rule, or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity"; or "(2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity." N.J. Stat. Ann. § 34:19-3(c).

Although Defendants have argued that Plaintiff merely disclosed a violation of Company policy, Moseley has testified that in March 2007, he reported what he believed to be "unethical conduct, misappropriation of company funds, and theft" by his direct supervisor. (Moseley Dep., 175:8-10.) As remedial legislation, CEPA should be construed liberally. <u>Estate of Roach v. TRW, Inc.</u>, 754 A.2d 544, 550 (N.J. 2000). Moreover, a plaintiff need not demonstrate that there was a violation of the law or fraud, but instead that he "reasonably believed" that to be the case. <u>Id.</u> The facts in this case support an objectively reasonable belief that a violation of law or fraudulent conduct was being committed by Plaintiff's supervisor. Therefore, the Court will not grant summary judgment on this issue.

Regarding the causal connection between Plaintiff's whistleblowing activity and the negative adverse employment actions taken against him, Plaintiff stresses that he was employed by the Defendants for twenty-five years without a negative employment

evaluation or any form of discipline until immediately after he disclosed the wrongful conduct of his supervisor.  Not only did Plaintiff then receive a negative performance evaluation, but the posted position of Plant Manager was given to Hynes, despite Hynes's alleged past negative history and despite that Plaintiff asserts he had been acting in that job for over two years.  Plaintiff contends that this is sufficient evidence of pretext.

The Court is unable to find as a matter of law that Defendants' inferences prevail or that a jury could not reasonably adopt a contrary inference of retaliation.  There are questions of fact as to how much the individuals responsible for Plaintiff's negative performance evaluations knew about Plaintiff's complaints.  "[A] finding of the required causal connection may be based solely on circumstantial evidence that the person ultimately responsible for an adverse employment action was aware of an employee's whistle-blowing activity."  Maimone v. City of Atlantic City, 903 A.2d 1055, 1065 (N.J. 2006).  Because jurors may infer a causal connection from the surrounding circumstances, as well as temporal proximity, the Court will not grant summary judgment.

<u>Conclusion</u>

For these reasons, as well as those placed on the record during oral argument,

IT IS ORDERED on this 26th day of April, 2011 that Defendants' motion for summary judgment [15] is hereby <u>DENIED</u>.

 /s/ Joseph H. Rodriguez 
JOSEPH H. RODRIGUEZ
U.S.D.J.
